KAHN, J.
 

 Appellants Bay County and Laguna Beach Properties, LLC, challenge the circuit court’s determination that a development order authorizing construction of a large beachfront resort is inconsistent with the Bay County Comprehensive Plan. For the reasons that follow, we reverse the order.
 

 BACKGROUND
 

 Laguna Beach is a community in western Bay County heavily populated with older, single-family homes dating from the 1930s and 1940s, as well as mobile homes and trailers rented or used for transient purposes. The court below received evidence of economic distress and crime in the area.
 

 In 1999, Bay County amended the Bay County Comprehensive Plan (“Plan”) with a focus on future uses of land in Laguna Beach. Provisions of the Plan, as amended, designated several beachfront areas, including parts of Laguna Beach, as a “seasonal/resort” category of land use. By Plan terms, such category would “provide areas for a functional mix of compatible seasonal/resort land uses where the clientele are predominantly seasonal or temporary visitors and tourists.” Such areas consist of “concentrations of accommodations and businesses that are used for nonresidential, tourist-oriented purposes.” “Allowable uses” of land in the “seasonal/resort” area include: “[b]each houses, cottages, condominiums, townhouses, apartments or other similar multi-family structures, motels, hotels, lodges, restaurants, convenience stores, retreats, and lounges, bars, and other similar uses and public utilities.” Under Plan amendments, the county sought to create a tourism-oriented area and chose Plan language reflective of such goal: “Year-round permanent residences should not be located in this area. Lounges and bars are permitted only as an accessory use to multifamily structures, motels, hotels, or restaurants.” “No more than fifteen (15) dwelling units per acre” are permitted in a “seasonal/resort” area. The Plan reflects the county’s intent to transform Laguna Beach from an older seaside community to a tourist district. Neither the validity nor the wisdom of Bay County’s Plan is at issue in the present case. Instead, our focus is upon a proposed resort development project.
 

 In 2005, Bay County approved a development proposal submitted by appellant Laguna Beach Properties, LLC, to build “a resort condominium” called “the Mayan.” According to the development order (“DO”), the resort would include “279 living/rental units,” built in 22 stories on slightly less than two acres. As a condition of the DO, the county imposed concurrency requirements, among them a bond from the developer to ensure the infrastructure improvements that the Mayan will necessitate.
 

 Appellee Brenda Harrison lives near the site of the proposed resort and opposes construction of the Mayan. Harrison and appellee West Beaches Neighborhood Defense Fund, Inc. (“Fund”), an organization of concerned Laguna Beach homeowners, initially appealed the DO to the Bay County Commission. After that challenge failed, appellees filed the present lawsuit in the circuit court. Their complaint alleged, in relevant part, that the DO authorizing construction of the Mayan was in
 
 *118
 
 consistent with the Plan. Appellees sought injunctive and declaratory relief.
 

 During a five-day trial, the circuit court received evidence concerning characteristics of the Mayan, resulting traffic, and related matters. A county planner testified that, because the condominium units in the Mayan would resemble hotel rooms more than residential apartments, the Plan’s density restrictions would not apply to the Mayan. At the conclusion of the trial, the circuit court concluded the DO was inconsistent with the Plan. The court considered that the two-acre resort would include 279 resort condominium units in an area where the Plan authorized only fifteen dwelling units per acre. In the final judgment granting injunctive relief and voiding the DO, the judge reasoned:
 

 Two hundred seventy nine “transient” occupied units has [sic] a density nine and one-half times that permitted for resident “occupied” structures. If 16 residential units per acre is [sic] a violation of the purposes and goals of the Comprehensive Plan, 279 transient units on less than two acres surely must also violate them.
 

 The decretal portion of the order voided the DO and enjoined the county from reissuing an order “unless the Comprehensive Plan is amended to definitively permit such a development of that property.” At oral argument, able counsel for appellees conceded that the trial court’s application of the Plan’s density restriction to transient units would effectively outlaw almost all hotels in a “seasonal/resort” district such as the Laguna Beach area.
 

 ANALYSIS
 

 Bay County and Laguna Beach Properties have jointly appealed the order. Although we agree with the circuit court that the Fund had standing to maintain its claims in this case, we reverse the final judgment because the Plan’s density restriction for dwelling units does not apply to the resort construction at issue. We conduct our review de novo, as no disputed facts play into our decision.
 
 See Dixon v. City of Jacksonville,
 
 774 So.2d 763, 765 (Fla. 1st DCA 2000).
 

 By statute, a local government may not authorize any development that would be inconsistent with the applicable comprehensive plan. § 163.3194(l)(a), Fla. Stat. (2005). An aggrieved party may challenge a DO as inconsistent with a comprehensive plan by filing a consistency challenge in circuit court. § 163.3215(3), Fla. Stat. (2005). In a chapter 163 consistency proceeding, a court will find “consistency” between a DO and the extant comprehensive plan
 

 if the land uses, densities or intensities, and other aspects of development permitted by such order or regulation are compatible with and further the objectives, policies, land uses, and densities or intensities in the comprehensive plan....
 

 § 163.3194(3)(a), Fla. Stat. (2005).
 

 Under the statute, a reviewing court will evaluate consistency “by reference to ‘the objectives, policies, land uses, and densities and intensities in the comprehensive plan,’ itself.”
 
 Buck Lake Alliance, Inc. v. Bd. of County Comm’rs of Leon County,
 
 765 So.2d 124, 127 (Fla. 1st DCA 2000) (quoting § 163.3194(3)(a), Fla. Stat. (1997)). Courts construe a plan’s silence as to a particular land use as indicative of planners’ intent not to authorize that particular use.
 
 See Dixon,
 
 774 So.2d at 766.
 

 As a preliminary matter, we note that appellants have challenged the Fund’s standing to join as a plaintiff in the action below. Section 163.3215(3), Florida Statutes (2007), permits “[a]ny aggrieved or adversely affected party” to bring a consistency challenge. “[T]he term ‘aggrieved
 
 *119
 
 or adversely affected party’ means any person ... that will suffer an adverse effect to an interest protected or furthered by the local government comprehensive plan....” § 163.3215(2), Fla. Stat. (2005). Because section 163.3215 is a remedial statute affording aggrieved parties the right to enforce comprehensive plans, courts liberally construe the statute to grant standing to a broad class of plaintiffs.
 
 See S.W. Ranches Homeowners Ass’n, Inc. v. Broward County,
 
 502 So.2d 931, 935 (Fla. 4th DCA 1987);
 
 see also Educ. Dev. Ctr., Inc. v. Palm Beach County,
 
 751 So.2d 621, 623 (Fla. 4th DCA 1999) (explaining that “[sjection 163.3215 enlarged the class of persons with standing to challenge a development order as inconsistent with the comprehensive plan,” and holding statute must be construed liberally). The Fund demonstrated below that the proposed development would adversely affect a substantial number of its individual members, and we do not disturb the circuit court’s conclusion that the Fund had standing to join this action.
 

 In resolving the merits, however, the court erred by finding the DO at issue inconsistent with the Plan because the condominium units would exceed the Plan’s 15-dwelling-unifi-per-acre density restriction. By all accounts, the Mayan would be the substantial equivalent of a hotel, an allowable use of land in Laguna Beach. Accordingly, the project will not be comprised of “dwelling units” as that phrase appears in the Plan’s density restriction.
 

 Under the DO, the Mayan would be a “resort condominium.” Such a use is regulated by chapter 509, Florida Statutes (2007), and defined as “any unit or group of units in a condominium, cooperative, or timeshare plan which is rented more than three times in a calendar year” for less than a month at a time. § 509.242(l)(c), Fla. Stat. (2005). Chapter 509 describes “resort condominiums” as “public lodging establishments,” along with hotels and motels. § 509.242(1), Fla. Stat. (2005). Accordingly, resort condominiums, like hotels, are not residences or dwellings, but are permanent structures that accommodate temporary visitors.
 
 See generally Schwarz v. City of Treasure Island,
 
 544 F.3d 1201, 1214 (11th Cir.2008) (explaining that, “as the administrative definition of ‘dwelling unit’ suggests, the house, apartment, condominium, or co-op that you live in is a ‘residence,’ but the hotel you stay in while vacationing at Disney World is not”).
 

 Some land use plans in Florida distinguish between restrictions on the density of residential dwellings and restrictions on the density of hotel- and resort-type units.
 
 See, e.g., City of Cocoa Beach v. Vacation Beach, Inc.,
 
 876 So.2d 719, 720 n. 2 (Fla. 5th DCA 2004) (reciting density restrictions in municipal zoning ordinance as follows: “No part of the City of Cocoa Beach shall be zoned to a residential density greater than ten (10) dwelling units per acre for permanent occupancy dwellings, or twenty-eight (28) units per acre for transient lodging establishments (hotels and motels).”);
 
 Innkeepers Motor Lodge, Inc. v. City of New Smyrna Beach,
 
 460 So.2d 379, 380 (Fla. 5th DCA 1984) (discussing “density cap” in local zoning ordinance that imposed different restrictions on residences and hotels). The Plan in this case, however, does not include such a distinction.
 

 Although not addressing lodging establishments or hotels in terms of density, the Plan imposes two density requirements: a high “population” minimum of 5,000 people per square mile, and a “housing” restriction of no more than 15 “dwelling units” per acre. The density requirement utilized by the trial court is the “housing” restriction. The term “housing” carries a dimension of permanence: “housing” is “shelter; lodging; dwellings provided for people.”
 
 Webster’s New Collegiate Dictio
 
 
 *120
 

 nary
 
 550 (5th ed. 1973). “Dwelling” is “a building or other shelter in which people live: house.”
 
 Id.
 
 at 352. The county’s planners evidently appreciated the permanency that the term “housing” conveys; in other sections, the Plan refers to “housing” in the context of county residents’ permanent homes. Both the terms “dwelling” and “housing” in the Plan evoke a sense of permanency — they are places where “people live” — that could not reasonably be ascribed to a class of temporary or transient accommodations, such as the Mayan, secured by tourists on their Gulf beach vacations. Conspicuously, Bay County chose not to impose a density cap for lodging establishments, reflecting the county’s intent not to limit the density of public lodging establishments such as the Mayan. That planners, when they wish, may indeed impose different density limitations for residential and non-residential property supports this conclusion.
 
 See, e.g., Vacation Beach, Inc.,
 
 876 So.2d at 720 n. 2;
 
 Innkeepers Motor Lodge, Inc.,
 
 460 So.2d at 380.
 

 Considering next “ ‘the objectives, policies, land uses, and densities and intensities in the comprehensive plan,’ itself,”
 
 Buck Lake Alliance,
 
 765 So.2d at 127, the DO was, in fact, consistent with the Plan. The Plan describes the “seasonal/resort” land use category as comprising “[a]reas with concentrations of accommodations and businesses that are used for non-residential, tourist-oriented purposes.” The category’s purpose is “[to] provide areas for a functional mix of compatible seasonal/resort land uses where the clientele are predominately seasonal or temporary visitors and tourists.” Examples of allowable uses include “condominiums,” “hotels,” and “similar uses.” The Plan expressly discourages year-round permanent residences. The Plan thus envisions an area friendly to “non-residential, tourist-oriented purposes” frequented by “seasonal or temporary visitors and tourists.”
 

 The intended use of the Mayan — to offer resort accommodations to tourists — conforms in material respects with the purposes of the Plan and the types of uses envisaged for “seasonal/resort” developments. If “hotels” are allowable uses, as they are in the Plan, then a resort condominium with the characteristics of the Mayan must be, as well. The Mayan’s condominium units are not “dwelling units.” The trial judge erred in finding the DO inconsistent with the Plan on the basis of a density restriction that does not apply to the Mayan.
 

 CONCLUSION
 

 The face of the Bay County Comprehensive Plan bespeaks Bay County’s intent to transform the Laguna Beach neighborhood to an environ primarily touristic in character. The DO in this case fits quite neatly with the Plan. We agree that the Fund had standing to join as a plaintiff below, but we REVERSE the final judgment in all other respects and REMAND with instructions to enter judgment for appellants.
 

 DAVIS and CLARK, JJ., concur.